**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR SEARCH WARRANT**

I, Paul W. Mullen, depose and state as follows:

**AGENT BACKGROUND**

1. Since November 2008, I have been employed as a Special Agent of the Federal Bureau of Investigation ("FBI"). I am currently assigned to the Boston Division, Portsmouth, New Hampshire Resident Agency and the FBI New Hampshire Joint Terrorism Task Force, investigating domestic terrorism and violent white supremacy extremists. Prior to this, from October 2017 through January 2021, I worked on the New Hampshire Safe Streets Gang Task Force, investigating violent crimes, firearms violations, drug violations, criminal gangs and organized crime. From February 2016 through October 2017, I was assigned as a Task Force Agent to the Drug Enforcement Administration (DEA), New Hampshire Heroin Strike Force, Manchester Division Office, Bedford, New Hampshire, investigating drug distribution enterprises and overdose death cases. In my work with the FBI, I have investigated both national security and criminal matters. I am also a trained member of the FBI Evidence Response Team. I have prepared and sworn to search warrant and arrest warrant affidavits for the FBI related to these investigations. I have executed search warrants and arrest warrants which have resulted in the seizure of evidence and individuals. I have acquired experience in these investigations through training at the FBI Academy in Quantico, Virginia, and by conducting investigations in the field. Prior to being a Special Agent with the FBI I was employed as a Trooper with the New Hampshire State Police. I am also an attorney licensed to practice in the State of New Hampshire and State of Maine.

2. Based on my training, experience, and information provided to me by other law enforcement officers, I am familiar with the modus operandi used by individuals engaged in the

violation of various federal offenses. For example, I have handled many cooperating sources and witnesses who have provided information to me specifically related to narcotics and firearms offenses. I have also reviewed court-authorized wiretap intercepts between drug traffickers, individuals engaged in violations of the Federal Firearms Act, individuals conspiring to commit armed robberies, and individuals engaged in the violation of other federal offenses. Many of these investigations have resulted in the execution of search warrants, arrest warrants, and eventual convictions.

3.  I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral reports made to me by agents of the FBI and other federal, state, and local law enforcement agencies.

## PURPOSE OF AFFIDAVIT

4.  I submit this affidavit in support of an application for a search warrant pursuant to Federal Rule of Criminal Procedure 41 and Title 18, United States Code, Section 2703(c)(1)(A) to compel Facebook, Inc., 1601 Willow Road, Menlo Park, CA 94025 ("Facebook") to provide historical and prospective information, further described in Attachment B, for the accounts assigned the following identifiers as further described in Attachment A:

    a.  Facebook UID 100009706470640 also known as "Casper Carr"; and

    b.  Facebook UID 100024474471998 also known as "Cas Carr" (collectively, the "**Target Accounts**").

5.  Because this warrant seeks the prospective collection of information that may fall within the statutory definitions of information collected by "pen register" and/or "trap and trace device," *see* 18 U.S.C. §3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. See 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the

information required to be included in an order pursuant to that statute. *See* 18 U.S.C. §3123(b)(1).

6. This affidavit is intended to show merely that there is probable cause for the requested warrants pertaining to the **Target Accounts**, and does not set forth all of my knowledge about this matter.

## OVERVIEW OF INVESTIGATION

7. Since March 2018, I have been investigating the Brothers of White Warriors ("BOWW"), a white supremacy gang that was formed in approximately 2006 within the New Hampshire prison system.

8. BOWW espouses, promotes, and documents their support for white supremacy through tattoos and other symbols often associated with white supremacist ideology.

9. Members and associates of BOWW are responsible for supporting white supremacist ideology, recruiting new members, and expanding their sphere of influence in the State of New Hampshire and more recently over the border into the State of Maine. BOWW leadership directs members and associates to conduct various criminal offenses in support of BOWW, including but not limited to (1) using firearms, knives, and other weapons while performing crimes of violence or drug trafficking crimes; (2) obtaining and sharing legal and illegal firearms among members; (3) committing acts of violence against individuals and groups that conflict with BOWW beliefs and members; (4) conducting money laundering to support BOWW and its criminal activities; and (5) utilizing the Internet and social media to facilitate BOWW's criminal activity.

10. Nikolas Carr and his brother, Nate Carr, are verified members of BOWW based on the New Hampshire Department of Corrections records.

11. Nikolas Carr is a felon and is a prohibited person relative to firearms. Carr has an extensive criminal history with convictions for resisting arrest, disobeying an officer, criminal threatening, burglary, theft by extortion, violation of protective order, criminal mischief, criminal trespass, and sale of controlled drugs.

12. Nikolas Carr's nickname is "CASPER" and he also has a Casper tattoo on his left arm. Carr has a BOWW tattoo on his chest and the numbers "2662", which stands for "BOWW forever, forever BOWW". Carr also has behind his ear the numbers "205", which stands for "BOWW over everything". While in state prison Carr was found with a letter to another BOWW member, which he signed CASPER 2662 with a swastika.

13. On April 1, 2021, Carr sold 10 grams of heroin/fentanyl for $240.00 to a New Hampshire Attorney General's Drug Task Force Confidential Human Source ("CHS") in the parking lot of his then residence address of Morningstar Apartments, 173 Loudon Road, Concord, NH. During the drug transaction, Carr had what the CHS described as a small chrome plated .22 pistol, which he made a point of showing the CHS and asking the CHS if he liked it.

14. On April 8, 2021, Carr sold 10 grams of heroin/fentanyl for $240.00 to a New Hampshire Attorney General's Drug Task Force CHS.

15. On April 22, 2021, Carr sold 10 grams of heroin/fentanyl for $240.00 to a New Hampshire Attorney General's Drug Task Force CHS.

16. The April 1, 8, and 22, 2021, drug purchases by the CHS were controlled drug buys that were monitored by law enforcement, with the law enforcement officials meeting the CHS before each drug purchase at an undisclosed location to check the CHS for money, controlled drugs, weapons or any other type of contraband. The CHS was provided money for the drugs to be purchased by the law enforcement officials and physical surveillance of the CHS

was made through out each drug transaction.   After each drug transaction, the law enforcement officials followed the CHS back to the undisclosed location to recover the drugs, turned off the audio recording devices, and again checked the CHS for money, controlled drugs, weapons or any other type of contraband.   The law enforcement officials also debriefed the CHS about the drug transactions with Carr.

17. The April 1, 8, and 22, 2021, drug evidence recovered from Carr were each weighed by law enforcement officials and then sent to the New Hampshire State Police laboratory for testing and confirmed by the laboratory as fentanyl.

18. On June 21, 2021, Carr was arrested by the Concord, New Hampshire, Police Department after fleeing from the police.   Carr initially gave the police a different name and then dropped his backpack and ran.

19. The Concord PD was able to apprehend Carr and identified that he had a Merrimack County Arrest warrant that was no bail for HS failure to appear for a burglary.

20. The Concord PD recovered from his dropped backpack 104 rounds of .25 ACP ammunition, including a fully loaded six round magazine, a fully loaded 15 round magazine, and 83 rounds in a black bag sunglass case.

21. Concord PD also found drug paraphernalia in the dropped backpack, including a scale, grinder, 1000 small plastic baggies, and 25 needles, as well as residue/trace amounts of drugs that tested positive for heroin/fentanyl.

22. After the arrest on June 21, 2021, Carr was held without bail at the Merrimack County House of Corrections (MCHC), 314 Daniel Webster Highway, Boscawen, New Hampshire.

23. Carr primarily makes phone calls from MCHC to his mother; girlfriend, Amanda Fortin; and second girlfriend, Amanda Dutterer. In each call made by Carr from MCHC there is a recorded message advising Carr and the person receiving the call that the call is not private and is subject to monitoring and recording. In each call Carr states his name as "Casper" before the call is placed and accepted by the person on the other end of the call.

24. On June 27, 2021 at 9:35 AM, Nikolas Carr made a phone call from MCHC to telephone number (727) 267-3195, which is identified as belonging to his mother. During the phone call Carr asks his mother if she had "talked to Shea or Amanda" and the mother replies that she had spoken to both and that Shea put money on his prison phone account. Carr then asks "did she pick up my shit… listen my gun, they did not get my gun, my gun is in that house, it is behind the vent... I know they didn't get it, but they got both extended magazines I had on me."

25. On June 28, 2021 at 9:14 AM, Carr placed a phone call to telephone number (603) 496-8957, a registered number within the MCHC Securus system for Shana Dutterer. Carr states to Shana Dutterer "I'm smoked...supposedly fed charges now… cause some gun shit I guess… no gun… they found the two extended magazines in my backpack..." and asks her "listen did anyone goes to Caroline's yet… my thing is in her house…." Dutterer tells Carr that Amanda has it and that she is bringing it to a friend's house. Carr states "tell her to give it to C… all Amanda is going to do is get fucking charged with it...."

26. On June 29, 2021 at 9:23 AM, Carr made a phone call from MCHC to telephone number (603) 491-9146, which is identified as belonging to Amanda Fortin. Carr asks Fortin "that thing is safe right?" Fortin responds "yeah." Carr then advises that "the feds are trying to pick up my case now… cause I got caught with an extended magazine…. and 80 something

6

rounds…. They searched for like four hours for the gun, but they didn't find it obviously…. I told the cop that I would of shot it out with you if I had it." Carr asks Fortin "where is all my shit" and Fortin responds that all his possessions are at her grandfather's house.   Carr reassures Fortin "they don't have shit on me…listen I'm good… no gun babe, what are they gonna do…."   Carr tells Amanda "call C or Sarah and give them something so they can give you money."

27.  On June 29, 2021 at 9:48 AM, Carr made a phone call from MCHC to telephone number (603) 491-9146, which is identified as belonging to Amanda Fortin.   Carr states to Fortin that "I almost made it two years out... it's been a long fucking tear… look at all the shit I have skated from… in last two years…."   Carr tells Fortin that he received his discovery, and that "listen James and Caroline are snitches."   Carr also states the discovery talks about him having a .22 handgun during a drug sale.   Carr advises Amanda that "I have never had a .22…. no listen, 2020 that's when I took that n-----'s gun in Laconia, right?   Carr later says "try calling C or Sarah and tell them I'm asking them to give 2 for that thing." Amanda advised Carr that they told her what they wanted and Carr responds "they just wanted that one thing."   Carr stated that "if you need to get rid of it, then get rid of it to them, but don't to anybody else."

28.  On June 30, 2021, Nikolas Carr made a phone call from MCHC to telephone number (727) 267-3195, which is identified as belonging to his mother.   Carr tells his mother "I guess all my shit is in Hill at her [Amanda Fortin] grandparents' house."   Carr's mother responds "so Shea never got it" and Carr states "no, I don't know, Shea said she wasn't able to because she could not get a hold of the person whose house it was at."   Later in the conversation Carr states that he told Amanda to keep his clothes and sell everything else since "all the other shit I fucking got from selling drugs.... and none of it means anything to me…."   Carr then advises his mother "she has been trying to get that thing I have from Amanda so no one gets in

7

trouble, you know what I mean? and I told Amanda to give it to them and like they will pay Amanda for it just to hold it… so Amanda is not struggling... if she gets caught with it she is going to be fucked.... she has no …. gun on her."

29. On or about June 30, 2021, Pembroke Police Department executed a state search warrant, relative to 16 Mountain View Drive, Hill, New Hampshire, for the personal property of Nikolas Carr that had been moved there by his girlfriend, Amanda Fortin.

30. The owner of 16 Mountain View Drive, Hill, NH, is Robert Barker, the grandfather of Amanda Fortin.  Barker advised the Pembroke Police Department that Amanda Fortin had recently brought to his house several plastic containers and asked to store them in his basement.

31. As part of Nikolas Carr's personal property recovered from the plastic containers, the Pembroke Police Department seized a Jennings Firearms Model 25, .25 auto, Serial number 531245, with a silver barrel and a white grip, a magazine with (9) nine gold colored rounds that are stamped G.F.L. 6.35 and a brown Don Hume leather holster.

32. On July 1, 2021 at 11:49 AM, Carr made a phone call from MCHC to telephone number (603) 491-9146, which is identified as belonging to Amanda Fortin.  Carr tells Fortin to "make sure all my shit is safe… make sure you don't move anything, just leave it wherever it is." Later in the call Carr advises Fortin that he is being called down to processing in the jail and will call her after.

33. On July 1, 2021, Carr was brought to processing at MCHC and was interviewed and arrested by Pembroke, New Hampshire, Police Department, relative to burglaries that occurred in Pembroke on June 18, 2021.  Carr denied any knowledge of a .25 caliber gun found during the execution of a search warrant by Pembroke PD at 16 Mountain View Drive, Hill, New

Hampshire.  Carr acknowledged having the .25 caliber rounds in his backpack when arrested by Concord Police Department and stated that he found them behind a convenience store in Concord. Carr denied possession or ownership of the .25 caliber handgun, even though Pembroke PD advised Carr that he spoke to several people on the MCHC phones about the gun, including Amanda Fortin, who had stated to him that the gun was at her grandfather's in Hill, NH.

34. Pembroke Police Department also executed a state search warrant for Nikolas Carr's Black Samsung Galaxy S8 phone that was on his person when he was arrested by Concord Police Department.

35. On July 1, 2021 at 12:45 PM, Carr again made a phone call from MCHC to telephone number (603) 491-9146, which is identified as belonging to Amanda Fortin.  Carr tells Fortin "listen they raided your grandparents house… and they found some shit… they found something… look where my brother is at… that is what it means."

36. Nikolas Carr's brother, Nate Carr, was arrested by the FBI in 2018 and charged as a felon in possession of a firearm and is in federal prison in Oklahoma.

37. Carr then advises Fortin "you say what you want happened, but I'm not going to let you go down for something like that though."

38. Based on Carr's calls outlined above and based on the investigating agent's experience with gangs and firearm violations it is clear to the investigating agent that Carr knows that Fortin is also a convicted felon and not allowed to have firearms.

39.  Carr then tells Fortin that he was just charged with eight burglaries and then directs Fortin to "listen, get on my google account and delete everything right the fuck now… I don't give a fuck if this is being recorded… do you know the passwords or not… listen you

9

know the numbers that are on my wrist… all right it is that and fuck the police or fuck the police and then those numbers… I think it is the numbers first though, not the code to the lockbox…listen 11, 4, 7… just backwards though."

40. Carr then asks Fortin "what do you want to do, I need to know that right now…listen, what is the deal, you know nothing or what." Fortin asks Carr "what do you want me to say" and Carr responds "nothing." Carr tells Fortin "they say they found power tools and something else at the house… and I said yeah, I sell drugs that is how I got the power tools… then I said that other thing I have no idea what or who would have that, you know what I mean?" Fortin states that she does not even live there and Carr tells her to "just tell them it was my fault…" Fortin asks Carr what is she going to do and Carr states "listen it is not your address and it's not my address, we know nothing."

41. On July 1, 2021 at 6:32 PM, Nikolas Carr made a phone call from MCHC to telephone number (727) 267-3195, which is identified as belonging to his mother. Carr tells his mother "I'm fucked mom, I just got hit with a fucking million charges… they are saying they found a firearm and a bunch of shit… cause they raided Amanda's address and I guess they found one there… they said I said something on the phone, but possession is 9/10ths of the law, I never got caught with shit." Carr then exclaims "the feds don't have a hold of me yet… if all this shit goes down then I am going to get fucking smoked like Nate did… how long he got 10 years or 8 years…." Later in the call Carr states Fortin did not know of the Pembroke police search at her grandfather's house until he told her "they raided your grandparents house in Hill, NH, like 16 Mountain View Road or something… they seized a bunch of power tools and a firearm… he [Pembroke PD detective] said the firearm matches the same ammunition you had."

42. On August 11, 2021 at 9:42 PM, Carr made a phone call from MCHC to telephone number (802) 427-0985, which is identified as belonging to Amanda Fortin. During an argument with Fortin about his infidelity, Carr at one point states that he swears "on my daughter's life, grandmother's life, and patch and everything…." The investigating agent interprets the "patch" reference to be to Carr's membership in BOWW and his tattoos indicating such. Later in this call Carr exclaims to Fortin that he provided for her, "on the street I'm robbing N-----s and doing crazy shit just so you don't have to ever say a word…."

## PROBABLE CAUSE THAT THE TARGET ACCOUNTS CONTAIN EVIDENCE RELATED TO VIOLATIONS OF FEDERAL LAW

43. The **Target Accounts** belong to the social media platform Facebook (operated by Facebook, Inc.). Generally speaking, this platform is a free-access social networking website, which allows individuals to create online profiles where photographs, videos, and commentary can be posted and viewed by other members of the same platform. Many social media services like Facebook, also offer public and private built-in messaging applications, like Messenger, where users of the service can directly communicate with each other.

44. A 2018 search warrant return record for Nate Carr's Facebook provided reference to "Casper" and Facebook user id number 100009706470640.

45. A review of Carr's Black Samsung Galaxy S8 phone seized by Pembroke Police found a Facebook profile under "Cas Carr", account number 100024474471998.

46. A review of Carr's Black Samsung Galaxy S8 phone seized by Pembroke Police indicates it is a fairly new phone with chat sessions only from May 31, 2021, through June 17, 2021, which contains general discussions of drug dealing, prices, and drug terminology such as "balls", "up" and "hard."

47.     On August 10, 2021 at 8:50 PM, Carr made a phone call from MCHC to telephone number (603) 545-2518, asking for the female who answers to message his people on his Facebook.

48.     On August 11, 2021 at 12:26 PM, Carr made a phone call from MCHC to telephone number (802) 427-0985, which is identified as belonging to Amanda Fortin.  Carr talks about pending drug charges and communicating on Facebook with the New Hampshire Attorney General's Drug Task Force CHS about a drug deal.  Carr states "this n----- went inside an apartment building and said I sold him dope… anyone could make a Facebook under my name and say this you know what I mean, it's not even my name who the fuck is to say it is my Facebook…"  At the end of the call Carr talks to someone in the jail and then tells Fortin that the FBI just showed up looking for Shea and Clayton and that Fortin should "message Clay right now and tell him."

49.     The investigating agent notes that "message" is a common reference to Facebook messenger.

50.     On August 15, 2021, at 6:07 PM, Carr made a phone call from MCHC to telephone number (802) 427-0985, which is identified as belonging to Amanda Fortin.  During the call Carr asks Fortin where the three cell phones they have are located.

51.     In the investigating agent's experience individuals, such as Nikolas Carr, and groups that are supplying drugs often utilize numerous phone numbers for short periods of time and multiple social media accounts in order to limit the possibility of law enforcement's monitoring of their calls and online activity.

52. Members and associates of BOWW are known to communicate via Facebook Messenger as you do not need an active phone number to utilize this technology and it can be accessed through any Internet connection or hot spot.

53. Based on my training, experience, and discussions with other law enforcement officers, I believe the **Target Accounts** likely contain evidence related to violations of federal law, including illegal drugs, firearms or various components of the firearms that have travelled in interstate commerce prior to their possession by Nikolas Carr and other BOWW members and associates.

## INFORMATION RELATED TO FACEBOOK

54. Based on my training, experience, and discussions with other law enforcement officers, I know the following about social media providers such as Facebook:

    a. Social media providers ask users to provide basic contact information, either during the registration process or thereafter. This information may include the user's full name, birth date, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, tokens, and other personal identifiers;

    b. Social media users can select different levels of privacy for the communications and information associated with their accounts. By adjusting these privacy settings, a user can make information in the user's account available only to himself or herself, to other specified users of the social media service, to all users of the social media service, or to anyone with access to the Internet, including people who are not users of the social media service;

    c. Social media accounts include privacy settings that users can adjust and control. Depending on the user's privacy settings, social media providers may also obtain and store the physical location, or GPS data, of the user's device(s) as they interact with the social media service on those device(s);

    d. Social media users can exchange private messages on the social media service with other users. These messages, which are similar to e-mail messages, are sent to the recipient's account, which also stores copies of messages sent by the recipient, as well as other information. Social media users can also post comments on the profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile;

    e. Social media users can post photographs, videos, and other forms of content on their accounts. This content may be posted permanently, with an expiration date, or can be deleted by the user at any time. Regardless of the content's status, the social media provider may have the content stored on the servers;

    f. Social media providers retain IP address logs for a given user ID. These logs may contain information about the actions taken by the user ID, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.

55. Therefore, the computers of Facebook are likely to contain the material listed above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, location/GPS

information, IP address logs, account details, message content, photographs, videos, and other forms of content. Some of the information, such as location/GPS information and IP address logs, can be prospectively provided by Facebook.

56. Information in possession of Facebook is critical for law enforcement in their efforts to collect evidence of violations of federal law committed by Nikolas Carr, as well as other BOWW members and associates. For example:

    a. The subscriber information for the **Target Accounts** may include active phone numbers and email addresses for BOWW members, both of which could be further exploited to identify additional BOWW members and associates engaged in criminal activity.

    b. The content, to include messages, photographs, and videos, will likely include private conversations amongst BOWW members and associates that detail conversations related to the acquisition of firearms and controlled substances.

    c. The historical location data associated with the **Target Accounts** will assist law enforcement in determining where BOWW members and associates live and store illegally possessed firearms and controlled substances.

    d. The prospective data requested for the **Target Accounts** will allow law enforcement to monitor the locations of BOWW members and associates in real-time.

57. Ultimately, when all of the requested information is used in conjunction, law enforcement hopes to obtain evidence showing 1) where and how Carr and other BOWW members and associates are unlawfully obtaining firearms, 2) where and how Carr and other

BOWW members and associates are unlawfully obtaining controlled substances, and 3) where and how Carr and other BOWW members and associates are illegally storing firearms and controlled substances.

## **CONCLUSION**

58.     Based on the information described above, there is probable cause to believe that Nikolas Carr owns and controls the **Target Accounts** and that information in possession of Facebook relating to those accounts will aid law enforcement in their investigation of Carr's violations of 18 U.S.C. § 922(g)(1) (Felon in Possession of Firearm/Ammunition); 18 U.S.C. § 922(g)(3) (Possession of Firearm by Unlawful User of Controlled Substances); 18 U.S.C. § 924(c) (Possession of Firearm During Crime of Violence/Drug Trafficking Crime); and 21 U.S.C. § 841 (Distribution of and Possession With Intent to Distribute Controlled Substances).

/s/ Paul W. Mullen
Paul W. Mullen, Special Agent
Federal Bureau of Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and complaint.

Date: Sep 17, 2021

Time: 2:37 PM, Sep 17, 2021

Honorable Andrea K. Johnstone
U.S. Magistrate Judge

16

## ATTACHMENT A

This search warrant is being sought for the data specified in Attachment B for the following Facebook accounts, which are hosted by Facebook, Inc. 1601 Willow Road, Menlo Park, CA 94025 (hereafter, "Target Accounts"):

a. Facebook UID 100009706470640 also known as "Casper Carr"; and

b. Facebook UID 100024474471998 also known as "Cas Carr."

# ATTACHMENT B

**I.     Historical Information to be disclosed by Facebook, Inc.**

To the extent that the information is within the possession, custody, or control of Facebook, Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each Target Account listed in Attachment A for the time period of March 1, 2021, to the present:

(a) All subscriber information and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, passwords, security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers for the Target Account;

(b) All past and current usernames for the Target Account;

(c) All privacy and account settings;

(d) All profile information, including the date and time the Target Account was created and the Internet Protocol ("IP") address at the time of sign-up;

(e) Payment information associated with the Target Account (including any credit card or bank account number);

(f) All information regarding the particular device or devices used to login or access the Target Account, including the IMEI, IMSI, MEID, ESN, Serial Number, Push Token, Phone Number, Android ID, Apple ID, etc.;

(g) All cookie information and additional accounts linked by cookies;

(h) All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

(i) A list of all of the accounts the Target Account follows and all accounts who are following the Target Account (*i.e.*, the user's "following" list and "followers" list), as well as the Target Account friend lists (past and current friends);

(j) A list of all users that the Target Account has "unfollowed" or blocked;

(k) All records of searches performed by the Target Account, including all past searches saved or deleted by the account;

(l) All information about connections between the Target Account and third-party websites and applications;

(m) The content of all records, deleted or otherwise, of communications and messages made or received by the Target Account, including all private messages, Messenger chats, direct messages, chat history, video calling history, and pending and/or rejected "Friend" requests;

(n) News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; groups and networks of which the Target Account is a member, including the groups' identification numbers; future and past event postings; gifts; pokes; tags; and information about the Target Account's access and use of applications;

(o) All user content created, uploaded, or shared by the Target Account, including any comments made by the Target Account on photographs or other content;

(p) All photos and videos associated with the Target Account, including those uploaded, downloaded, and/or wherein the Target Account is tagged;

(q) All photographs and images in the user gallery for the Target Account;

(r) All "check ins," other location information, Last Known locations, geotag, and GPS measurements;

(s) All IP logs, including sign-in/sign-out IP addresses and intrasession/intersession IP addresses detailing messages sent/received, Messenger/direct messages, posts, uploads, and all other activity;

(t) All activity logs for the Target Account and all other documents showing the user's posts and other activities;

(u) All records of the account's usage of the "Like" feature, including all posts and all webpages and content that the user has "liked";

(v) All information about the pages that the account is or was a "fan" of;

(w) All information about the user's access and use of Marketplace;

(x) The types of service utilized by the user; and

(y) All records pertaining to communications between Facebook/Instagram and any person regarding the Target Account, including contacts with support services and records of actions taken.

II. **Prospective Information to be disclosed by Facebook, Inc.**

To the extent that the information is within the possession, custody, or control of Facebook, Inc. ("Facebook"), Facebook is required to disclose the following information to the government for each Target Account listed in Attachment A for a period of forty-five (45) days from the date of issuance of this warrant:

(a) All physical location data and GPS data collected by Facebook for the user of the

       account, including any data collected by Facebook's location services via the user's mobile phone or other device, on a real-time or near-real time basis; and

(b)    All IP address information collected by Facebook for the user of the account, including log-ins/log-outs and IP addresses associated with messages, posts, and all other activity on a real-time or near-real time basis.

### III. Information to be Seized by the Government

(a)    All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. § 922(g)(1) [Felon in Possession of Firearm/Ammunition]; 18 U.S.C. § 922(g)(3) [Possession of Firearm by Unlawful User of Controlled Substances]; 18 U.S.C. § 924(c) [Possession of Firearm During Crime of Violence/Drug Trafficking Crime]; and 21 U.S.C. § 841 [Distribution and Possession With Intent to Distribute of Controlled Substances].

(b)    All information described above in Section II. This data shall be made accessible by Facebook to the Federal Bureau of Investigation 24/7, day or night, and emailed to Special Agent Paul W. Mullen at pwmullen@fbi.gov at regular intervals.